# In the United States Court of Federal Claims

No. 15-111C

(Filed Under Seal: May 18, 2015)

(Reissued for Publication: May 27, 2015)[1]

*****************************************
| | |
|---|---|
| NVE, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * Post-Award Bid Protest; Navy |
| | * Procurement for NSA Bethesda and |
| THE UNITED STATES, | * Walter Reed Janitorial and Custodial |
| | * Services; Time for Challenging an |
| Defendant, | * Agency's Corrective Action Decision; |
| | * Discretion in Performing Best Value |
| and | * Evaluation; Rational Basis Standard; |
| | * Judgment on the Administrative Record. |
| ACE MAINTENANCE & SERVICES, INC., | * |
| | * |
| Defendant-Intervenor. | * |
| | * |
*****************************************

*Keith L. Baker*, Barton, Baker, Thomas & Tolle, LLP, McLean, Virginia for Plaintiff.

*Alexis J. Echols*, Trial Attorney, with whom were *Benjamin C. Mizer*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Claudia Burke*, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., and *Ann L. Giddings*, NAVFAC, Of Counsel, for Defendant.

*Adam K. Lasky*, Oles Morrison Rinker & Baker LLP, Seattle, Washington for Intervenor.

---

[1] The Court issued this opinion under seal on May 18, 2015 and gave the parties until May 26, 2015, to submit any proposed redactions of competition-sensitive, proprietary, confidential, or other protected information. The parties submitted their proposed redactions, which have been accepted by the Court. Redactions are indicated by [* * *]. The Court also corrects a typographical error made on page 8 of the opinion.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

In this bid protest, Plaintiff NVE, Inc. ("NVE") challenges a contract award by the Naval Facilities Engineering Command ("NAVFAC") to ACE Maintenance & Services, Inc. ("ACE") for janitorial and custodial services at the Naval Support Activity medical facility in Bethesda, Maryland ("NSA Bethesda"). This facility includes the Walter Reed National Military Medical Center ("Walter Reed"). NVE's protest concerns the agency's third round of proposal evaluations, following two protests at the Government Accountability Office ("GAO") and agency corrective action decisions in response to the protests.

In the first round of proposal evaluations, NAVFAC determined that NVE's proposal offered the best value to the Government and the agency awarded a contract to NVE on February 28, 2014. ACE and another offeror, Fresh Air Duct Cleaning, LLC ("Fresh Air") protested this award at the GAO on multiple grounds, including that the agency failed to engage in meaningful discussions. Believing it had not engaged in meaningful discussions, NAVFAC took corrective action, and the GAO dismissed both protests as moot. The agency then reopened discussions and reevaluated the offerors' proposals. Following the reevaluation, NAVFAC found ACE to be the apparent successful offeror. NVE protested this award at the GAO and the agency once again decided to take corrective action. After another round of proposal evaluations, NAVFAC again determined ACE to be the successful offeror and awarded ACE the NSA Bethesda contract on January 22, 2015.

NVE protested the award to ACE at this Court on February 3, 2015. The Court permitted ACE to intervene on the side of Defendant. The parties filed cross-motions for judgment on the administrative record and the Court heard oral argument on May 5, 2015.

The Court finds that NVE's challenges to NAVFAC's corrective action decisions after submitting a proposal for reevaluation are waived. An offeror cannot fully participate in a second round of proposal submissions and then later challenge the agency's corrective action decision. Instead, the law requires NVE to submit its challenges to an agency's corrective action before the due date for proposal resubmission. <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, 1313 (Fed. Cir. 2007). NVE's other arguments lack merit. The agency's evaluation of proposals and its best value determination during the third round of proposal evaluations were rational. Even if the agency's evaluation was not entirely rational, NVE suffered no prejudice. NVE's price was significantly higher than ACE's, and NAVFAC was justified in selecting the lower-priced proposal if it found that the differences in the non-price technical factors did not justify a [* * *] price premium.

Accordingly, for the reasons explained below, Plaintiff's motion for judgment on the administrative record is denied. Defendant's and Intervenor's cross-motions for judgment on the administrative record are granted.

## Factual Background[2]

NAVFAC issued a solicitation requesting proposals for a firm fixed-price indefinite delivery/indefinite quantity ("IDIQ") contract to perform janitorial and custodial services at NSA Bethesda on June 11, 2013. Administrative Record ("AR") Tab 1, at 1, 6. NSA Bethesda includes Walter Reed, the largest medical complex within the Department of Defense, with more than 2.4 million square feet of clinical space. Walter Reed provides care to approximately one million beneficiaries each year. NSA Bethesda's base also includes the President's Hospital which provides care for members of Congress and senior government officials. AR 11.

The solicitation specified that the contract was a small business set-aside for a one-year base period with four one-year option periods, not to exceed a total of five years. AR 6. The contract required the awardee to "furnish all labor, supervision, management, tools, materials, equipment, facilities, transportation, incidental engineering, and other items necessary" to provide the specified janitorial and custodial services. AR 10. The solicitation also stated that the "Service Contract Act (SCA) Wage Determination and a Collective Bargaining Agreement [(CBA)] are included in this solicitation." AR 6.

### A.     Solicitation Requirements and Evaluation Factors

Under the terms of the solicitation, the contract award would be made to the offeror whose proposal offered the best value to the Government. AR 170. The following non-price factors were evaluated as the basis for a best value tradeoff analysis: (1) Technical/Management Approach; (2) Corporate Experience; (3) Safety; and (4) Past Performance on Recent, Relevant Projects. Past Performance was the most important non-price factor. AR 170, 181. The technical factors and the Past Performance factor, when combined, were equal in importance to price. AR 170, 181. The solicitation also stated that "[t]he importance of price [would] increase if the Offerors' non-cost/price proposals are considered essentially equal in terms of overall quality, or if price is so high as to significantly diminish the value of a non-cost/price proposal's superiority to the Government." AR 181.

---

[2] The facts in this decision are taken from the administrative record. The pages in the administrative record are numbered in sequence, and the documents are divided by tabs. The Court's citations to the administrative record generally are to the page numbers, except that large documents are referenced by the tab number.

For Factor 1, Technical/Management Approach, the agency assigned each offeror an adjectival rating of "Outstanding, Good, Acceptable, Marginal, or Unacceptable." AR 171. A rating of "Outstanding" meant the proposal met the solicitation requirements and demonstrated an "exceptional approach and understanding of the requirements" with very low risk of unsuccessful performance. A rating of "Good" meant the proposal met the requirements and demonstrated "a thorough approach and understanding of the requirements" with low risk of unsuccessful performance. Id. The solicitation called for a transition plan that would accomplish phase-in within 60 days.[3] AR 182.

For Factor 2, Corporate Experience, the solicitation required that each offeror submit three projects showing "Recent, Relevant corporate experience." "Recent, Relevant corporate experience" is defined as "[e]xperience of the team with respect to the proposed responsibility regarding hospital/healthcare and commercial janitorial services of similar size, scope, and complexity to this requirement performed within the last five years preceding the release date of the solicitation." AR Tab 2, at 208. Similar size meant the project was for "$10 [million] or greater during any one contract period under one contract." AR Tab 3, at 213. Each offeror would then be assigned a relevancy rating: "Very Relevant, Relevant, Somewhat Relevant, or Not Relevant" based upon the breadth and depth of experience in projects of similar size, scope and complexity submitted. AR Tab 1, at 172. A rating of "Very Relevant" meant the "[p]resent/past performance effort involved essentially the same scope and magnitude of effort and complexities th[e] solicitation required." A rating of "Relevant" meant the "present/past performance effort involved similar scope and magnitude of effort." An offeror received a rating of "Somewhat Relevant" if the "present/past performance effort involved some of the scope and magnitude of effort." Id.

Factor 3, Safety, was comprised of three elements: Experience Modification Rate ("EMR"); Occupational Safety and Health Association ("OSHA") Days Away from Work, Job Restriction, or Transfer ("DART") rate; and Technical Approach to Safety. AR 173. The solicitation directed the evaluators to consider the three elements collectively when assigning the overall adjectival rating. It also provided the following guidelines to the evaluators of what EMR and DART rates corresponded to one of the following risk ratings: "Very Low Risk, Low Risk, Moderate Risk, High Risk, or Extremely High Risk." Id.

---

[3] The Agency later amended the transition period to 30 days and offerors submitted revised transition plans. AR Tab 11, at 302.

| Risk | EMR Rate |
|------|----------|
| Very Low Risk | Less than 0.6 |
| Low Risk | From 0.6 to less than 0.8 |
| Moderate Risk | From 0.8 to 1.0 |
| High Risk | Greater than 1.0 to 1.1 |
| Extremely High Risk | Greater than 1.1 |

| Risk | DART Rate |
|------|-----------|
| Very Low Risk | Less than 1.0 |
| Low Risk | From 1.0 to 1.99 |
| Moderate Risk | From 2.0 to 2.99 |
| High Risk | From 3.0 to 4.0 |
| Extremely High Risk | Greater than 4.0 |

Id.  Like the Corporate Experience evaluation, the first aspect of the Past Performance evaluation was based upon relevancy considering the size, scope and complexity of the projects submitted.  AR 173-74 (offerors would receive an adjectival rating of "Very Relevant, Relevant, Somewhat Relevant, or Not Relevant").  This factor, however, also included a performance confidence assessment to determine how well the contractor performed on previous projects.  Each offeror was then assigned one of the following adjectival ratings: "Substantial Confidence, Satisfactory Confidence, Limited Confidence, No Confidence, or Unknown Confidence."   A rating of "Substantial Confidence" meant the Government had a "high expectation that the offeror [would] successfully perform the required effort."  A rating of "Satisfactory Confidence" meant the "Government has a reasonable expectation that the offeror will successfully perform the required effort." AR 174-75.

For the price proposal, NAVFAC requested that the offerors provide: (a) "a narrative description of the price proposal and any underlying assumptions that influenced its preparation"; (b)"a narrative detailing the linkage of the proposed price with the proposed level of effort proposed in Factor 1 – Technical/Management Approach"; (c) "a narrative of the rationale for the inflation rates applied to each of the option years pricing"; and (d) an Excel spreadsheet providing the detailed basis for the prices listed in the Exhibit Line Item Numbers ("ELINs") so that the Government "may gain insight into unit prices in order to validate them."[4]   The solicitation also specified that the Government would "evaluate the consistency of the linkage of the proposed price with the proposed level of effort proposed in Factor 1 – Technical/Management Approach."  AR 182.  NAVFAC would then evaluate the total price to ensure that it was fair and reasonable.  Id.

---

[4] The solicitation also requested offerors, as part of their price proposal, to complete Section B, Contract Line item Numbers (CLINs) 7000 through 9004 and to complete Section J, ELIN Pricing, Attachment J-0200000-06 ELINS.xls.  AR Tab 1, at 182.

B.     First Round of Proposal Evaluations

Offerors submitted their initial proposals in August 2013.  See, e.g., AR Tabs 13-14 (ACE's and NVE's initial proposal submissions).  NAVFAC received timely proposals from seven offerors, including NVE and ACE.  AR Tab 17, at 977.  On February 28, 2014, the Source Selection Authority ("SSA") concluded that NVE's proposal offered the best value to the Government and made an award to NVE.  AR Tabs 30-31A ("NVE's proposal clearly demonstrates superior experience through its successful management and execution of all projects submitted . . . .  Additionally, NVE's proposal provides a vastly superior technical approach and management plan").  ACE and Fresh Air protested the award at the GAO, alleging that NAVFAC made errors in its proposal evaluations, failed to conduct meaningful discussions, and its short 30-day transition plan was unduly restrictive of competition in favor of the incumbent, NVE.  AR Tabs 49, 53.

NAVFAC voluntarily took corrective action, believing that it had not engaged in meaningful discussions.  AR Tabs 50, 54.  The agency also revised the solicitation to amend the transition period from 30 days back to 60 days.  See AR Tab 1, at 182; AR Tab 12, at 303-05.  Accordingly, the GAO dismissed the ACE and Fresh Air protests as moot.  AR Tabs 52, 57.  On March 13, 2014, the agency issued a stop work order to NVE requiring NVE to cease all work under the contract awarded on February 28, 2014, "until further notice."  AR Tab 60.  On April 2, 2014, NAVFAC de-obligated funds under NVE's contract.  AR Tabs 61-63.

C.     Second Round of Proposal Evaluations

Following GAO's dismissal of the ACE and Fresh Air protests, NAVFAC reopened discussions with the four offerors in the competitive range: ACE, NVE, Fresh Air and Zero Waste Solutions, Inc.  AR Tabs 32-33, 39.  During the discussions, NAVFAC addressed weaknesses in ACE's initial proposal, including its transition plan and corporate experience.  AR Tab 33a.  Offerors submitted final proposal revisions on June 23, 2014.  AR Tab 35, at 1592 (ACE); AR Tab 36, at 1904 (NVE).  ACE included a transition plan showing that phase-in would be completed within 60 days as required by the solicitation.  AR Tab 35, at 1603.  In its initial proposal, ACE had proposed [* * *] days, with transition for a significant portion of the buildings to be completed within [* * *] days.  AR Tab 13, at 317.  This transition plan resulted in the agency assigning a significant weakness to ACE on Factor 1 because the agency considered the phase-in period to be unrealistically expeditious.  AR Tab 21, at 1319.

The Technical Evaluation Team ("TET") continued to assign ACE a weakness for its phase-in plan, however, due to a clerical error in ACE's transition plan, showing that

ACE planned for a [* * *]-day transition period, instead of the required 60 days.  AR Tab 37 at 2059 (stating that "[o]fferor[] acknowledges the 60 day phase in period, but their transition plan shows that it will take [* * *] days to fully assume all locations listed in the [solicitation]").  After ACE clarified in writing that its phase-in start date was July 3, 2014 and not August 1, 2014 as listed in its transition plan chart, the Source Selection Evaluation Board ("SSEB") removed the weakness the TET had assigned to ACE, and changed its rating on Factor 1 from Acceptable to Good.  AR Tab 39, at 2079.  This change lifted ACE's overall technical rating from Acceptable to Good.  Id.  In its final proposal revision, ACE also provided additional information on its example projects for the Corporate Experience evaluation factor.  The additional information demonstrated that ACE's example projects met the solicitation's $10 million size-relevancy standard.  ACE also substituted one of its example projects for another that more clearly met the solicitation's size standard.  AR Tab 33a, at 1585-87.  This change removed the significant weakness assigned in the first round of proposal evaluations and ACE received a rating of "Very Relevant/Good" for the Corporate Experience Factor.  AR Tab 37, at 2060-61.

In reevaluating NVE's proposal, the agency eliminated two of the four strengths on Factor 1 that NVE had received in the first round of the proposal evaluations, which lowered its rating on Factor 1 from "Outstanding" to "Good."  Compare AR Tab 30, at 1550-1551 with AR Tab 37, at 2047.  However, the Overall Technical Rating of NVE's proposal remained "Good."  AR 2046.

After evaluating the final revised proposals, NAVFAC determined that ACE's proposal offered the best value.  See AR Tab 40, at 2085.  The agency notified NVE on July 23, 2014 that ACE was the apparent successful offeror.  AR Tab 40a.  NVE protested the award to the GAO alleging that the agency did not identify additional strengths in NVE's technical proposal which would have resulted in a technical rating of "Outstanding", did not validate unit prices, or evaluate the linkage between the offerors' proposed prices with the level of effort proposed in Factor 1 as required by the solicitation.  AR Tab 41, at 2088.  Following the protest, NAVFAC determined that a reevaluation of the final revised proposals was necessary, and informed GAO that it again intended to take corrective action.  Accordingly, on September 9, 2014, the GAO dismissed NVE's protest.  AR Tab 43.  NVE also protested the award to ACE at the U.S. Small Business Administration ("SBA"), challenging ACE's size status due to its use of a non-small business subcontractor, J&J Maintenance, Inc.  The SBA denied NVE's size protest and the SBA Office of Hearing and Appeals affirmed ("OHA").  Notice of SBA OHA Decision No. 5638, Dkt. No. 21.

D.     Third Round of Proposal Evaluations

In reevaluating the offerors' final revised proposals, the SSEB reviewed the reports of the TET and the price evaluator.  AR Tab 46, at 2147.  The Board then summarized the findings of the TET and the price evaluator as follows:

| | NVE | ACE |
|---|---|---|
| **Factor 1: Technical/Management Approach** | Good | Good |
| **Factor 2: Corporate Experience** | Very Relevant/Outstanding | Very Relevant/Good |
| **Factor 3: Safety** | Acceptable | Good |
| **Overall Technical Rating** | Good | Good |
| **Factor 4: Past Performance** | Very Relevant/Substantial Confidence | Very Relevant/Satisfactory Confidence |
| **Price** | [* * *] | $69,698,540 |

AR 2147-48.  The SSEB considered the technical ratings of each offeror along with the prices submitted and conducted a comparative analysis to arrive at its recommendation.  AR 2148.  In considering the offerors' proposals, the SSEB concluded that ACE's and NVE's proposals were superior to the other offerors under the technical factors.  It found ACE's and NVE's proposals "somewhat comparable" under the past performance factors.  The SSEB recommended award to ACE because it would "save the government more than [* * *] million dollars over the life of the contract," and there was "no technical advantage of NVE's proposal that [was] significant enough to outweigh the considerable price premium associated with its proposal."  AR 2150.  The SSA agreed, finding that although NVE's non-price proposal rated higher than ACE's, the benefits did not outweigh the [* * *] price differential.  Further, it cited concerns with NVE's proposal on the Safety factor, as NVE received [* * *] ratings in both the EMR and DART rates.  AR Tab 47, at 2154-55.

8

NAVFAC awarded ACE the contract on January 22, 2015.  AR Tab 48.  NVE filed this protest at the Court on February 3, 2015.  NVE filed its motion for judgment on the administrative record on March 30, 2015.  Dkt. No. 53 (corrected).  Defendant and Defendant-Intervenor filed their cross-motions for judgment on the administrative record on April 13, 2015.  The Court heard oral argument on May 5, 2015.

Discussion

I.      Jurisdiction and Standard of Review

Under the Tucker Act, the Court has jurisdiction over an action by an interested party objecting to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Court reviews bid protests in accordance with the standards of the Administrative Procedures Act ("APA").  Impresa Construzionoi Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Under the APA, agency action shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706; see also Impresa Construzioni, 238 F.3d at 1332 (procurement decision may be set aside if (1) "the procurement official's decision lacked a rational basis"; or (2) "the procurement procedure involved a violation of regulation or procedure").  To prevail, a protestor must not only show a significant error in the procurement process, but also that the error prejudiced the protestor. See, e.g., HomeSource Real Estate Asset Servs., Inc. v. United States, 94 Fed. Cl. 466, 478 (2010).  In a post-award bid protest such as this one, the standard requires the plaintiff to demonstrate that there was a "substantial chance it would have received the contract award, but for the alleged error in the procurement process."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

In a best value procurement, the agency has even greater discretion than if the contract were awarded based upon price alone.  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  For example, in determining the proposal that offers the best value to the Government, the "agency has the discretion to select a lower-priced, lower-technically-rated proposal if it decides that the higher price of a higher-technically-rated proposal is not justified."  Blackwater Lodge & Training Ctr., Inc. v United States, 86 Fed. Cl. 488, 514 (2009).  The agency will be able to demonstrate proper discretion if "it documents its final award decision and includes the rationale for any business judgments and tradeoffs made."  Id.

Review of an agency's procurement decision is generally limited to the administrative record.  See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("[T]he focal point for judicial review should be the administrative record

already in existence").  Unlike a Rule 56 summary judgment motion, the existence of genuine issues of material fact does not preclude judgment on the administrative record under Rule 52.1.  Tech. Sys., Inc. v. United States, 98 Fed. Cl. 228, 242 (2011).  Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006).

Under its bid protest jurisdiction, the Court is "empowered to award any relief [it] considers proper, including declaratory and injunctive relief."  28 U.S.C. § 1491(b)(2); see also Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  For a permanent injunction to issue, the Court considers the following four factors: (1) whether plaintiff succeeded on the merits; (2) whether plaintiff will suffer irreparable harm in the absence of injunctive relief; (3) whether the balance of hardships to the parties favors granting injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  While no single factor is dispositive, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial of injunctive relief."  Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 701 (2010).  Plaintiff must show entitlement to injunctive relief by clear and convincing evidence.  CSE Constr. Co. v. United States, 58 Fed. Cl. 230, 261 (2003).

II.   Analysis

NVE's challenges to NAVFAC's award of the NSA Bethesda contract to ACE can be summarized in three broad categories: (1) the agency's decision to reopen discussions with offerors in the competitive range after it already had awarded the contract to NVE; (2) the propriety of the agency's third evaluation of the offerors' proposals; and (3) the SSA's final best value determination.  For the reasons explained below, none of Plaintiff's challenges has merit.

A.   NVE Waived its Right to Challenge the Agency's Corrective Action Decision.

As an initial matter, the Court finds that NVE waived its right to challenge the agency's decision to take corrective action and to reopen discussions and reevaluate proposals with offerors in the competitive range after NAVFAC already awarded NVE the NSA Bethesda contract.  A party who participates in a second round of proposal submissions rather than protesting cannot subsequently challenge an agency's decision to reopen discussions or reevaluate proposals.  See Sheridan Corp. v. United States, 95 Fed. Cl. 141, 149-150 (2010) ("were the Court to dismiss Sheridan's claims as not ripe for review, the current protest grounds later could be challenged as untimely if Sheridan does

10

not prevail during the resolicitation process"); see also Cubic Def. Sys. v. United States, 45 Fed. Cl. 450, 461 (1999) ("Cubic failed to complain of this alleged error at the appropriate time – when the Air Force continued to allow Metric to compete, or at least prior to submitting its final offer"). Vendors cannot "sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm." Blue & Gold Fleet, 492 F.3d at 1313.

Here, once NAVFAC notified NVE that it would reopen discussions with offerors in the competitive range, the agency's proposed corrective action became ripe for protest. See AR Tab 50.  Thus, if NVE had concerns with the agency's proposed corrective action, the time to protest was before the revised proposals were due.  See Cubic Def. Sys., 94 Fed. Cl. at 461.  NVE was not permitted to wait for the agency to complete the corrective action to see if it received the award.  Blue & Gold Fleet, 492 F.3d at 1313.  Plaintiff fully participated in the second round of proposal evaluations instead of protesting the agency's actions.  See AR Tab 36, at 1904.  Accordingly, NVE's challenges regarding NAVFAC's decision to take corrective action are waived.

### B.   The Agency's Third Evaluation of Proposals Was Rational and Did Not Prejudice NVE.

The Court next examines NVE's arguments regarding the agency's third round of proposal evaluations.  Specifically, NVE contends that NAVFAC's reevaluation of the proposals was flawed because: (1) the agency did not "evaluate the consistency of the linkage of ACE's proposed price with the level of effort proposed in Factor [1] – Technical/Management Approach" as required by the solicitation; (2) the agency did not validate the unit prices as required by the solicitation or it would have determined that ACE did not price its proposal in accordance with the CBA wage rates; and (3) the agency irrationally, and without explanation, eliminated two strengths from NVE's proposal on Factor 1, Technical/Management Approach and eliminated evaluated weaknesses of ACE's proposal, which raised ACE's technical ratings.  See Pl.'s Mot. for J. on the Admin. R. ("Pl.'s MJAR") at 4, 25-34, Dkt. No. 53.

### 1.   The Agency Properly Evaluated the Consistency of the Linkage Between ACE's Proposed Price with its Proposed Level of Effort and Was Not Required to Conduct a Price Realism Analysis.

First, NVE argues that NAVFAC did not evaluate the "consistency of the linkage of ACE's proposed price with the level of effort proposed in Factor [1] – Technical/Management approach."  See Pl.'s MJAR at 13.  As support for its argument, NVE cites a discussion question from the agency to ACE which states "[y]our proposed price appears significantly low in relation to your estimated level of effort . . . . Please

review your proposal and explain your execution and pricing strategy." Pl.'s MJAR at 15; AR Tab 23, at 1347. According to Plaintiff, this discussion question demonstrates that the agency was aware of ACE's price being too low compared to its proposed number of Full Time Equivalent ("FTE") personnel. Despite this awareness, NVE asserts that the agency did not evaluate the consistency of the linkage between ACE's proposed price and its proposed level of effort. Pl.'s MJAR at 15-17. Further, NVE argues that it was irrational for the agency to ignore the risk associated with ACE's proposal since ACE adjusted the required labor hours per position by the use of a "Productive Factor" that was based on ACE's experiences and efficiencies. Id. at 16-17.

The Government and ACE claim NVE is arguing that NAVFAC should have conducted a price realism analysis to determine if ACE's price was unreasonably low. See Def.'s Cross-Mot. for J. on the Admin. R. ("Def.'s MJAR") at 19-23, Dkt. No. 57; Intervenor's Cross-Mot. for J. on the Admin. R. ("Intervenor's MJAR") at 29-33, Dkt. No. 58. They claim only a price reasonableness analysis was required by the solicitation as this was a fixed-price contract and under the terms of the solicitation, a proposal could not be rejected for offering a low price. Def.'s MJAR at 19; Intervenor's MJAR at 30-33; AR Tab 1, at 182 (price will be evaluated to determine if it is "fair and reasonable").

An agency is required to evaluate proposals only in accordance with the terms of the solicitation. See Banknote Corp. of America v. United States, 56 Fed. Cl. 377, 386 (2003). The Government cannot "rely upon undisclosed evaluation criteria in evaluating proposals." Id. Where an award of a fixed-price contract is contemplated, "a proposal's price realism is not ordinarily considered, since a fixed-price contract places the risk" of loss on the contractor. See Acad. Facilities Mgmt. v. United States, 87 Fed. Cl. 441, 466 (2009) (citing FAR 15.404-1). Thus, for a price realism analysis to apply in a fixed-price contract, the solicitation must expressly or implicitly require a price realism analysis for a proposal to be rejected for an unrealistically low price. Ceres Envtl. Serv., Inc. v. United States, 97 Fed. Cl. 277, 306 (2011).

The administrative record suggests that NAVFAC evaluated the linkage between ACE's proposed price and proposed level of effort in its Technical/Management approach. Both NVE and ACE provided a detailed narrative and an Excel spreadsheet with specific bases for the prices listed in the ELINs. See AR Tab 1, at 7; AR Tab 35.5, at 1657 (ACE states they used a productive hour rate to determine the number of FTEs needed to perform the required services), AR Tab 35.9 (ACE's Excel Spreadsheet); AR Tab 36, at 1922 (NVE explains how they calculated the number of FTEs for the required hours of service), AR Tab 36.2, at 1929 (NVE's Excel spreadsheet). The agency also provided a review and evaluation of the offerors' prices in the October 29, 2013 Price Analysis. AR Tab 17, at 1047 (chart compares offerors' firm-fixed-price with the number of FTEs proposed). Moreover, the discussion question that the agency submitted to ACE regarding its number

of FTEs suggests that the agency at least contemplated the connection between the offerors' total price with their proposed number of FTEs.  <u>See</u> AR Tab 23, at 1347.  Finally, nothing in the record demonstrates that ACE's price became inherently risky because it used a "Productive Factor" to calculate the required number of FTEs as NVE suggests.  The Productive Factor was based upon reasonable sources – ACE's own contract experience and the International Sanitary Supply Association ("ISSA") standards.  <u>See</u> AR Tab 1, at 108 (ISSA provides the "cleaning industry time standards used for estimating/bidding projects/jobs/contracts"); AR Tab 13a, at 340-41.  NAVFAC reasonably accepted ACE's use of a "Productive Factor" in its price proposal.

However, even if the agency did not evaluate the "consistency of the linkage" between ACE's proposed price and proposed level of effort, NVE was not prejudiced because ACE's proposal could not be eliminated for an unrealistically low price.  The solicitation did not expressly or impliedly state that a price realism analysis would be conducted.  <u>See, e.g.</u>, Ceres Envtl., 97 Fed. Cl. at 306.  Indeed, had the agency conducted a price realism analysis, an offeror could have challenged the analysis as "arbitrary, capricious, or an abuse of discretion" because the agency would be relying upon undisclosed evaluation criteria in making its award.  <u>See</u> Banknote Corp., 56 Fed. Cl. at 386.  If ACE proposed an unreasonably low price, the risk of loss is on the contractor.  It would be irrational for the agency to reject ACE's proposed price simply because it was the lowest when all of the offerors, including NVE, proposed significantly lower prices than the Independent Government Estimate by approximately [* * *] percent to [* * *] percent.  AR Tab 44, at 2114 (noting "all four offerors['] total prices [were] within 8% of the average").

> 2. <u>In a Fixed-Price Contract, the Contractor Bears the Risk of Loss for Below CBA Wage Rates and Offerors Were Not Permitted to Escalate CBA Wage Rates in the Option Years.</u>

Next, NVE argues that NAVFAC did not "validate the unit prices" of ACE's proposal or it would have "determined that ACE priced the base year of the contract using wage rates in effect for October 1, 2013 to September 30, 2014, not wage rates in effect for the base year of the contract" and did not escalate wage prices for the option years.  <u>See</u> Pl.'s MJAR at 20, 22-25.  The differences between ACE's and NVE's proposal on the wage rates used for the base year plus option years of the contract make up approximately $2,600,000 of the more than [* * *] price difference between NVE's proposal and ACE's proposal.  <u>See</u> Report of Jimmy J. Jackson, at 9, Dkt. No. 53-1 (ACE's price would increase by [* * *]).

Even though ACE and NVE used different CBA wage rates for the base year and option years of the contract, it has no effect on the outcome of this protest.  First, even if

ACE did not use the correct CBA wage rates in pricing the base year of its contract, this fact would only result in a [* * *] price increase to ACE's contract for the base year.  See id. at 11.  There would still be a significant gap between ACE's proposed price and NVE's proposed price.  Such a small increase to ACE's proposed price likely would not have affected the best value determination.  In a fixed price contract, the offeror bears the risk of using the wrong CBA wage rates, unless it shows an intent not to be bound by the Service Contract Act.  See K-Mar Indus., Inc. v. United States, 91 Fed. Cl. 20, 22-23 (2010).  Here, nothing in the administrative record demonstrates that ACE took an exception to the solicitation's CBA wage requirements that would render its bid nonresponsive.

Further, under the terms of the solicitation, NVE was not permitted to escalate wage rates for the option years.  See AR Tab 7, at 263 (stating that "[a]pplicable wage adjustments will be made in accordance with FAR 52.222-43, Fair Labor Standards Act and Service Contract Act – Price Adjustment (Multiple Year and Option Contracts)"); FAR 52.222-43 (the clause mandates that offerors "not include any allowance for any contingency to cover increased costs" for any option year).  Even if the escalation was permitted, or if the agency had evaluated NVE's price and ACE's price using identical CBA wage rates for the base year and all of the option years, NVE could not show prejudice because there would still be a significant difference between ACE's proposed price and NVE's proposed price.  Def.'s MJAR at 22-23 (approximately [* * *] difference).  Thus, NAVFAC would be acting well within its discretion if it determined that a [* * *] price difference did not warrant acceptance of an equal or slightly superior technical proposal.  See Blackwater Lodge, 86 Fed. Cl. at 514.

3.   NAVFAC Had a Rational Basis for Changing its Evaluation of NVE's and ACE's Proposals on the Non-Price Factors.

Plaintiff also argues that it was irrational for the agency to eliminate two of its strengths on Factor 1 while raising ACE's technical ratings without a documented explanation during the reevaluation of the proposals.  See Pl.'s MJAR at 25-34.  Specifically, NVE contends that the agency: (1) should not have removed the weakness assessed by the TET for ACE's phase-in plan; (2) did not provide a rational explanation for raising ACE's relevancy rating on the Corporate Experience factor from "Relevant" to "Very Relevant" and raising its Corporate Experience rating from "Marginal" to "Good"; (3) did not provide a rational explanation for raising ACE's Safety rating from "Acceptable" to "Good" or explain why NVE's weakness on the Safety factor became a significant aspect of the source selection decision; (4) did not provide a rational explanation for raising ACE's relevancy rating on Factor 4 from "Relevant" to "Very Relevant"; and (5) did not provide a rational explanation for raising ACE's overall technical rating from "Satisfactory" to "Good."  Pl.'s MJAR at 30-34.

14

When an agency requests offerors to submit revised proposals, it may reevaluate those proposals and modify an offeror's strengths and weaknesses.  See Atlantic Driving Supply, Inc. v. United States, 107 Fed. Cl. 244, 261 (2012) ("[C]hanges in opinion between the initial evaluation and the reevaluation, and between the individual reviews and the consensus, are not unusual and do not indicate any 'illegitimate' action on the part of the Agency").  Thus, the mere fact that an offeror's scores changed upon reevaluation does not mean an offeror was treated unfairly.  See id.

Here, the agency had a rational basis for improving ACE's technical scores.  The discussion questions and responses from ACE resulted in an improved technical proposal in the round three proposal evaluations.  See, e.g., AR Tab 106, at 3261 (clarifying qualifications for key personnel); AR Tab 33a, at 1585-87 (showing that ACE replaced one of its projects to meet the $10 million size standard).  For example, in the first round of the proposal evaluations, the TET assigned ACE a rating of "Somewhat Relevant/Unacceptable" on the Corporate Experience factor because it only evaluated one project that was worth $5 million as ACE's proposal exceeded the solicitation's 125 page limit.  See AR Tab 17, at 1011.  In round three, however, the TET evaluated three projects, all of which exceeded $10 million in size.  See AR Tab 45, at 2136-37.  Similarly, the agency rationally changed ACE's rating on the Safety factor by adhering more closely to the definitions in the solicitation.  See AR Tab 49, at 2207.  Simply because NAVFAC did not provide a detailed written explanation comparing the differences between ACE's round one proposal and its round three proposal does not mean it was irrational for NAVFAC to improve ACE's rating on the non-price factors when ACE submitted a superior proposal.

NAVFAC also acted within its discretion in deciding that two of NVE's "strengths" on Factor 1 no longer qualified as strengths.  See Atlantic Driving, 107 Fed. Cl. at 261.  Moreover, NVE's argument overlooks that it is the third round of proposal evaluations which is at issue here.  Its arguments concerning the second round of proposal evaluations were waived.  See supra, at II.A.  During the third round of proposal evaluations, the TET assigned NVE a new strength that it was lacking during the round two proposal evaluations.  Compare AR Tab 37, at 2047 with AR Tab 45, at 2122.  The changes in the number of strengths assigned to NVE on Factor 1 simply reflect the agency's change of opinion from one evaluation to another.  Further, nothing in the record demonstrates that the agency improperly based its decision on NVE's Safety rating.  Rather, price appeared to be the determinative factor for the agency considering that both offerors submitted sound technical proposals.  Finally, the agency's evaluation did not prejudice NVE.  NVE's overall technical rating remained "Good" throughout all of the rounds of the evaluations even when it received a rating of "Outstanding" on Factor 1.  Compare AR Tab 30, at 1549 with AR Tab 46, at 2147-48.  Accordingly, a rating of "Outstanding" on Factor 1 could not have improved NVE's overall technical proposal to make a meaningful difference in the

best value determination and thereby have given NVE a substantial chance of receiving the contract award.

      C.    <u>The Agency's Best Value Determination Was Rational and Did Not Prejudice NVE.</u>

NVE contends that the agency placed too much importance on price in making its best value determination while deemphasizing the importance of past performance. Specifically, NVE points to the SSA's decision, which stated "[w]ith price being the overwhelmingly important aspect of the solicitation (approximately equal to ALL non-price factors combined), ACE's proposal clearly demonstrates a better overall value to the Government." AR Tab 47, at 2154. NVE asserts that price was only equal to the non-price factors and therefore, could not have been "the overwhelmingly important aspect" of the solicitation. <u>See</u> Pl.'s MJAR at 36-37. NVE also takes issue with the agency's evaluation of past performance. First, NVE says the SSEB's conclusion that ACE and NVE were "somewhat comparable" on the Past Performance factor was erroneous as NVE received the highest possible Acceptable rating while ACE received the lowest. Pl.'s MJAR at 35-36; AR Tab 46, at 2150. Second, the SSA did not mention any of the "excellent" and "exceptional" evaluations in its tradeoff analysis for NVE's past performance and irrationally adopted the SSEB's analysis that the two offerors were "somewhat comparable" on the Past Performance factor. <u>See</u> Pl.'s MJAR at 35-36.

The Court finds that there was nothing irrational about the SSA's best value determination. NVE misreads the SSA's analysis regarding price. The SSA recognized that price was "approximately equal" to all non-price factors as specified in the solicitation. AR Tab 47, at 2154. While the agency might not have chosen the best adjectives to describe the importance of price in the tradeoff analysis, this word choice did not mean the agency's best value determination was irrational. The SSA appeared to apply the appropriate weights to the price and non-price factors in making the best value determination. <u>See</u> AR Tab 47, at 2154 ("NVE's higher rating in corporate experience . . . and its substantial confidence rating in past performance does not warrant paying [* * *] [million] more when ACE has a solid technical proposal at a significantly lower price"). Further, the solicitation specified that price would become "increasingly important" if the offerors were relatively equal on the non-price factors. Unlike in the first round of proposal evaluations, ACE's overall technical rating improved from "Marginal" to "Good," the same overall technical rating that NVE received. Compare AR Tab 30 with AR Tab 47. ACE's non-price proposal became more comparable to NVE's non-price proposal even though NVE remained superior on the most important non-price factor, Past Performance. Thus, NAVFAC acted well within its discretion to choose ACE's lower-priced proposal despite NVE's slightly superior technical proposal. <u>See</u> <u>Blackwater Lodge</u>, 86 Fed. Cl. at 514.

Finally, there was no prejudice to NVE even if the agency erred by not recognizing significant differences between ACE's proposal and NVE's proposal on the Past Performance confidence assessment.  There is no indication that had NAVFAC not deemed the two offerors "somewhat comparable" on past performance, the agency would have recommended award to NVE, particularly given the stark difference in price between the two offerors.  NVE cannot overcome its heavy burden to show that the agency acted irrationally or that it was prejudiced in this case.

## Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the administrative record and request for a permanent injunction are DENIED.  The Government's and Intervenor's cross-motions for judgment on the administrative record are GRANTED.

On or before May 26, 2015 the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential or other protected information, and submit to the Court proposed redactions to this opinion, if any, before it is released for publication. The parties are requested to minimize their requested redactions so that the Court may publish as much of the decision as possible.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge

17